**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 14-cv-3286-CMA

KEITH QUINTANA,

    Petitioner,

v.

CAROLYN COLVIN,

    Respondent.

---

**ORDER REVERSING ALJ'S DECISION DENYING SOCIAL SECURITY DISABILITY BENEFITS**

---

This matter is before the Court on Plaintiff Keith Quintana's appeal of the Commissioner's decision denying his claim for disability benefits. Exercising jurisdiction under 42 U.S.C. § 405(g), this Court reverses the decision of the Administrative Law Judge ("ALJ").

## I. BACKGROUND

Plaintiff is a 42-year-old veteran who suffers from combat-related post-traumatic stress disorder (PTSD), arising from his service as a United States Marine in Somalia in the early 1990's. He alleges that his PTSD causes him severe anxiety, panic attacks, paranoia, and uncontrollable anger, and he has been admitted for psychiatric hospitalization on multiple occasions. He alleged an onset date for his disability of May

1, 2012. (AR at 452.)[1] The agency initially denied his claim on April 14, 2014 (AR at 343), and he appeared before an ALJ at an administrative hearing on July 22, 2014 (AR at 365-402). On August 14, 2014, the ALJ issued a decision finding Plaintiff was not disabled. (AR at 360.) In applying the five-step sequential evaluation process outlined in 20 C.F.R. § 416.920 to determine whether Plaintiff was disabled, the ALJ determined that:

1. Plaintiff had not engaged in substantial gainful activity since May 1, 2012, the alleged onset date [Step 1];

2. Plaintiff had the following severe impairments: post-traumatic stress disorder (PTSD), headaches, and obesity [Step 2];

3. Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 [Step 3];

4. Plaintiff had the residual functional capacity ("RFC") to perform light work that is simple, repetitive and unskilled and can be "learned by simple demonstration and is no more than two or three steps long," but was "unable to tolerate exposure to hazards, unprotected heights, climbing, or loud machinery," as well as "unable to interact with the public and is only able to tolerate limited interaction with co-workers." [Step 4]; and

5. Plaintiff was unable to perform his past relevant work (as a construction equipment operator, landscape gardener, or loader operator), but could perform jobs that exist in significant numbers in the national economy (including work as a housekeeper, garment sorter, or mail clerk) [Step 5].

The Appeals Council declined to review the ALJ's decision (AR at 1-3), making it final for purposes of review by this Court, *see, e.g.*, *Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003).

---

[1] Citations to the Social Security Administrative Record, which is found at Doc. # 10, will be to "AR" followed by the relevant page number.

## II.  STANDARD OF REVIEW

This Court's review of the ALJ's determination is limited to determining whether the ALJ's decision is supported by substantial evidence and whether the Commissioner – through the ALJ – applied the correct legal standards.  *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009).

Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  It requires more than a scintilla, but less than a preponderance.  *Id.* at 1084.  In reviewing the record and the arguments of counsel, the Court does not reexamine the issues *de novo, Sisco v. United States Department of Health and Human Services*, 10 F.3d 739, 741 (10th Cir. 1993), nor does it re-weigh the evidence or substitute its judgment for that of the Commissioner, *Salazar v. Barnhart*, 468 F.3d 615, 621 (10th Cir. 2006).  Thus, even when some evidence may have supported contrary findings, the Court "may not displace the agency's choice between two fairly conflicting views," even if the Court may have "made a different choice had the matter been before it *de novo*."  *Oldham v. Astrue*, 509 F.3d 1254, 1257-58 (10th Cir. 2007).

## III.  ANALYSIS

Plaintiff advances two principal claims on appeal.  First, he argues that the ALJ's finding at step three of the five-step sequential evaluation process outlined in 20 C.F.R. § 416.920 failed to properly account for the medical evidence indicating that Plaintiff's PTSD meets or medically equals a Listed Impairment.  Second, he argues that the ALJ erred in fashioning a mental RFC, because she did not account for Plaintiff's more

severe limitations, including his inability to interact with supervisors, and also made problematic credibility findings.

As explained in greater detail below, the Court agrees that the ALJ's step three assessment was improper, and that this error was not harmless. Because this error is an independent basis for remand, and very well could have infected the ALJ's later determinations, the Court does not address Plaintiff's remaining arguments.

The analysis of a claim at step three of the five-step evaluation process described above requires consideration of whether a claimant has an impairment that "meets" or "equals" any listing found at 20 C.F.R. § 404, Subpart P, Appendix 1 ("Listing"). If a claimant has such an impairment, he is deemed disabled and no further analysis is required. *See* 20 C.F.R. § 404.1520(a)(4)(iii); (d). A claimant's impairment "meets" a Listing if such impairment matches all of the specified criteria in one of the Listings. 20 C.F.R. § 404.1525(c)(3). An impairment "equals" a Listing where the impairments "is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). Plaintiff "has the burden at step three of demonstrating, through medical evidence, that his impairments 'meet all of the specified medical criteria' contained in a particular listing." *Riddle v. Halter*, 10 Fed. App'x. 665, 666–67 (10th Cir. 2001) (unpublished) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). However, an ALJ is required "to discuss the evidence and explain why he [or she] found that [a claimant] was not disabled at step three." *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1997).

To meet or "equal" the criteria for the Listing at issue, 12.06 ("anxiety-related disorders"), Plaintiff must show at least two of the following: "1. Marked restriction of activities of daily living; 2. Marked difficulties in maintaining social functioning; 3. Marked difficulties in maintaining concentration, persistence, or pace; 4. Repeated episodes of decompensation, each of extended duration." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 (12.06).

"Episodes of decompensation" are defined as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(4). Such episodes "may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system; or other relevant information in the record about the existence, severity, and duration of the episode." *Id.* The Regulations also define "repeated episodes of decompensation, each of extended duration" as "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks" but, if the Plaintiff experienced less frequent episodes of longer duration, the ALJ "must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence." *Id.*

In the instant case, in discussing whether Plaintiff met the Listing's required showing of "repeated episodes of compensation, each of extended duration," the ALJ

5

noted that Plaintiff was placed on a 72-hour hold in July of 2013, after presenting at the Emergency Room with increased anxiety and homicidal and suicidal ideation.[2] The ALJ concluded that this episode did not satisfy the requirements for a single episode of extended decompensation, due to the "the vague nature of the claimant's homicidal and suicidal ideations, his significant and quick response to treatment, and the brief duration of the event." (AR at 349.) However, the ALJ entirely failed to discuss evidence of Plaintiff's other hospitalizations and forms of longer-term, inpatient treatment; nor did she explain why she chose not to consider these incidents. (*See* AR at 348-49.)

Specifically, in November of 2009, Plaintiff was hospitalized for eight days at Highlands Behavioral Health for his PTSD, after "physical altercations over several weeks with his wife, father and cousin," which culminated in his firing a gun "outdoors in anger" and barricading himself in his house and threatening suicide. (AR at 1104, 1229.) Instead of being immediately discharged, he was transferred to a VA inpatient psychiatric unit in Denver where he obtained additional PTSD treatment and was discharged nine days later. (*Id.*) From November of 2011 to April of 2012, Plaintiff was incarcerated for a DUI charge, but was released on furlough for residential PTSD treatment for 30 days during his jail sentence. (AR at 1104, 1116.) Lastly, almost immediately after serving his jail sentence, Plaintiff entered the PTSD Residential

---

[2] Plaintiff presented at the hospital with "vivid flashbacks of children and mothers who had died during his service in Somalia. He endorses non-specific thoughts of hurting others. This is related to his feelings of being threatened and unsafe. . . . His mood has been poor recently and he has also been experiencing thoughts of self harm 5-7 times per day. . . He feels like his life has spiraled out of control and that he cannot function in the 'normal' world feeling this way." (AR at 1624, 1626-27.)

6

Rehabilitation Treatment Program at the VA Hospital in Denver, and spent seven weeks there, graduating at the end of May, 2012. (AR at 667, 797, 1104.)[3]

The Commissioner argues that the ALJ did not err in failing to discuss these other incidents because only part of the last of the incidents listed above, from 2012, is within the "relevant time period." (Doc. # 14 at 10.) However, it provides no legal authority for the proposition that episodes of decompensation may be considered only if they occur within the time period of an alleged disability; indeed, case law and Agency regulations are clear that evidence prior to the onset date of disability is to be considered to the extent that it sheds light on the disability during the relevant time period. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) ("[E]ven if a doctor's medical observations regarding a claimant's allegations of disability date from earlier, previously adjudicated periods, the doctor's observations are nevertheless relevant to the claimant's medical history and should be considered by the [ALJ]"); *Ledford v. Barnhart*, 197 Fed. App'x. 808, 810 n. 1 (10th Cir. 2006) (unpublished) ("Although [the claimant] is precluded from claiming benefits prior to November 30, 2000, evidence from the previously adjudicated period is still relevant.") Additionally, although the Commissioner states that it "does not concede" that the incidents qualified as episodes of decompensation, it does not explain **why** they did not qualify. (Doc. # 14 at 10-12.) In any case, both of these arguments amount to *post-hoc* rationalizations of

---

[3] Additionally, Plaintiff was admitted at the Southern Arizona Evaluation and Brief Treatment PTSD Unit from August 12, 2014 through September 3, 2014. (AR at 216, 309-313.) Although the evidence of this hospitalization incident was not before the ALJ, Plaintiff submitted medical evidence about it to the appeals council for review; as such, it is part of the Administrative Record.

the ALJ's decision which may not be used by the Court to affirm the decision. *See Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (the ALJ's decision should be evaluated based solely on the reasons stated in the decision); *see also Grogan v. Barnhart*, 399 F.3d 1257, 1263 (10th Cir. 2005) (a reviewing court may not create *post-hoc* rationalizations to explain the Commissioner's treatment of evidence when that treatment is not apparent from the Commissioner's decision). Indeed, the ALJ did not specifically weigh the relevant evidence of decompensation before her in making the determination that Plaintiff had not experienced episodes of decompensation, and "[i]n the absence of ALJ findings supported by specific weighing of the evidence, [the Court] cannot assess whether relevant evidence adequately supports the ALJ's conclusion that [claimant's] impairments did not meet or equal any Listed Impairment." *Clifton,* 79 F.3d at 1009.

Additionally, the ALJ found that Plaintiff had had "mild" restrictions in activities of daily living; "moderate" difficulties in concentration, persistence and pace; and "moderate" restrictions in social functioning. (AR at 348-49.) Specifically, the ALJ asserted that "no treating or examining physician suggested that claimant's impairments met or equal a listing." (Doc. # 348-49.) However, her discussion of Plaintiff's level of social functioning is cryptic and is – in full – as follows:

> The claimant has reported severe social anxiety, anger management problems, difficulty interacting with people, and episodes of isolation. The record clearly shows that the claimant has severe limitations in this interact [sic] appropriately with medical professionals, and shop in stores are some of the activities that show his social limitations do not reach a marked level. Therefore, the undersigned finds that the claimant has moderate limitations in social functioning.

8

(AR at 348.)

The medical evidence indicates, however, that Plaintiff's limitations in social functioning were not moderate, but "marked." Nevertheless, the ALJ entirely failed to acknowledge this evidence in her step-three analysis, much less discuss how she resolved the conflicts between this evidence and her findings of Plaintiff's "moderate" social limitations. For instance, Immaculate Wesley, Psy.D., first examined Plaintiff in March of 2009. (AR at 1651.) She saw him again in December of 2009; again in August of 2012, in connection with his VA disability application; and again in January of 2013. (AR at 389-90, 611, 1651.) In August of 2012, after examining Plaintiff, Dr. Wesley noted that Plaintiff

> has lost his ability to communicate with customers and has lost many jobs. He also becomes very aggressive with customers, blowing up and trying to over-control everyone and all situations. He is too withdrawn to return customer calls, has been unable to meet customers on time and fears that he cannot work at this time. His panic attacks have decreased in frequency since his inpatient stay at the PTSD program to about 2 times per week. He does note that [t]hey occur when he is around people and that when he was working he was having 4 per week. . . . [H]e does appear unemployable due to his sleeplessness, paranoia, and rage.

(AR at 617.) Additionally, she concluded that Plaintiff

> suffers from associated symptoms of PTSD including paranoid ideation, avoidance patterns that interfere with interpersonal relationships and have led to divorce and job loss. He also suffers from impaired affect modulation, self-destructive and impulsive behaviors, dissociative symptoms, feelings of shame, despair and hopelessness, feeling permanently damaged, hostility, social withdrawal, feeling constantly threatened. These all represent a dramatic change from his previous personality characteristics.

(*Id.*)

Dr. Wesley also completed a "Medical Source Statement" for Plaintiff in May of 2014. (AR at 1587.) She found that Plaintiff had "extreme" impairments in his ability to interact appropriately with the public, supervisors, and co-workers, as well as in his ability to respond appropriately to usual work situations and to changes in a routine work setting. (AR at 1588.) Specifically, she noted that

> the severity of [Plaintiff's] PTSD has resulted in his severe aggression (passive and active) and danger of hurting others. He could never deal well with supervisors and co-workers as he misinterprets incoming information, seeing threats where none exist. The claimant is totally impaired both occupationally and socially. He has [illegible] paranoid ideation with occasional visual hallucinations; cannot control his impulses whatsoever. (*Id.*)

Additionally, Plaintiff was treated by Eric H.A. Whyte, M.D. in July of 2014, for a 72-hour mental health hold. As discussed above, Plaintiff was placed in such a hold "due to suicidal ideation and homicidal ideation" (AR at 35), after he called the VA Crisis hotline with "thoughts of 'harming someone.'" (AR at 43.) After assessing Plaintiff, Dr. Whyte noted that

> [A]lthough for periods of time he can seem on top of things, [Plaintiff] can become quite easily overwhelmed and seemingly lose all coping skills. At those times he becomes labile, irritable, and hopeless. . . . He seems to have a reasonable short-term plan, although it sounds like there will be lots of logistics to manage in the upcoming months. . . . Meanwhile, with his difficulty dealing with the unexpected, trouble dealing with supervisors and having such poor coping skills, I believe he not able to hold down any kind of sustained employment. Consequently, from a clinical standpoint, I would consider him to be unemployable.

(AR at 23.)

The ALJ must evaluate "**all** relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation." 20 C.F.R. § § 404.1520a(c)(1),

416.920a(c)(1) (emphasis added). She must consider Plaintiff's impairments "throughout the disability determination process," which includes step three. 20 C.F.R. §§ 404.1523, 416.923. As explained above, it is clear she did not do so here. Although she pointed to Plaintiff's own hearing testimony and the fact that Plaintiff could shop in stores and interact appropriately with medical professionals, she did not mention, much less analyze, the medical evidence indicating that Plaintiff was far more than "moderately" impaired in social functioning. This falls woefully short of meeting the requirement that the ALJ discuss the relevant evidence and explain on the record why Plaintiff's impairments did not meet or equal the Listing in question. *See Clifton*, 79 F.3d at 1010 (internal citation omitted) ("a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position"); *Dye v. Barnhart*, 180 F. App'x 27, 29 (10th Cir. 2006) (unpublished) (finding similar conclusory statement that the claimant's impairment did not meet the listing to be error which required remand).

A step three error, however, does not automatically require remand. Instead, the Court must engage in a harmless error analysis and consider whether "confirmed or unchallenged findings made elsewhere in the ALJ's decision confirm the step three determination under review." *Fischer–Ross v. Barnhart*, 431 F.3d 729, 734 (10th Cir. 2005). If such findings "conclusively preclude Claimant's qualification under the listings at step three" such that "no reasonable factfinder could conclude otherwise," then any step three error is considered harmless. *Id.* at 735. If, however, there are no findings that "conclusively negate the possibility" that a claimant can meet a relevant listing, the

11

Court must remand to the ALJ for further findings.  *Murdock v. Astrue*, 458 F. App'x 702, 704 (10th Cir. 2012) (unpublished).

The Court has carefully considered the remainder of the ALJ's decision, and it cannot conclude that there are confirmed or unchallenged findings that "conclusively negate the possibility" that Plaintiff was presumptively disabled at step three.  In particular, the step three analysis of whether Listing 12.06 was met at least partially turned on whether the evidence showed that Plaintiff experienced "repeated episodes of decompensation, each of extended duration."  Because the ALJ entirely failed to consider evidence of Plaintiff's other episodes of decompensation anywhere in her decision, the ALJ's subsequent discussion and findings, by definition, cannot show that she properly considered the listing's criteria at step three.

Additionally, although the ALJ's subsequent discussion at steps four and five included some analysis as to why she assigned minimal weight to Dr. Wesley and Dr. Whyte's findings, this analysis was also problematic in its own right.  Specifically, the ALJ found that the limitations found by Dr. Wesley "are generally inconsistent with the previously discussed medical records," but she does not explain **which** medical records she is referencing, or **why** such records were inconsistent – making it impossible for this Court to determine whether her reasoning is sound.  (AR at 357.)  *See Hamlin,* 365 at 1217 ("Nor, in stating that the doctor's opinion was 'inconsistent with the overall case record,' did the ALJ specifically highlight those portions of the record with which [a treating physician's] opinion was allegedly inconsistent.")  Even more significant, the ALJ's primary justification for assigning minimal weight to Dr. Wesley's opinion was that

"the record clearly shows that the claimant does not have an extensive treatment relationship with Dr. Wesley," despite the fact that Dr. Wesley had seen and treated claimant multiple times over the course of several years.  (*Id.*)  At the same time, however, the ALJ assigned "substantial weight" to the medical opinion of Mark Suyeishi, Psy.D., the State Agency reviewing psychologist, who never met claimant, much less treated him.  (AR at 358.)  "The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all."  *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (citing 20 C.F.R. §§ 404.1527(d)(1), (2) and 416.927(1), (2)).  Additionally, it is clear that Dr. Suyeshi did not consider Dr. Wesley's or Dr. Whyte's findings in making his determinations; accordingly, his conclusions could well have been different in light of this evidence.  *See* (AR at 410) (listing evidence from "Immaculate Wesley PsyD" as being evidence that "has been requested"); (AR at 406-409) (list of evidence that was "received" does not include Dr. Wesley or Dr. Whyte's opinions).

In sum, the ALJ did not expressly consider the medical evidence in light of the listing's criteria, and the ALJ's findings at stages four and five cannot conclusively negate the possibility that plaintiff can meet Listing 12.06 at step three, such that "no reasonable factfinder could conclude otherwise."  *See Henderson v. Astrue,* 383 F. App'x 700, 702–03 (10th Cir. 2010) (unpublished) (quoting *Fischer–Ross*, 431 F.3d at 733–34).  As such, the ALJ's error at step three was not harmless, and requires reversal.  *See id.*

Because this error alone requires remand, the Court need not address the other arguments raised by Plaintiff.  *See Madrid v. Barnhart,* 447 F.3d 788, 792 (10th Cir. 2006) (when the ALJ's error affected the analysis as a whole, court declined to address other issues raised on appeal); *Watkins v. Barnhart,* 350 F.3d 1297, 1299 (10th Cir. 2003) ("We will not reach the remaining issues raised by appellant because they may be affected by the ALJ's treatment of this case on remand.").[4]

## IV.  **CONCLUSION**

Accordingly, it is ORDERED that the ALJ's denial of social security disability benefits is REVERSED.  This case is REMANDED to the Commissioner for proceedings consistent with this Order.

DATED:       June 29, 2015

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge

---

[4] The Court does not intend by this opinion to suggest the result that should be reached on remand.